UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

NORA ROBLES,

        Plaintiff,

v.                                                         Case No. 12-C-1172

GREEN BAY AREA PUBLIC SCHOOL DISTRICT,

        Defendant.

---

### DECISION AND ORDER

---

Plaintiff Nora Robles brought this action against the Green Bay school district, alleging that her employment was terminated due to discriminatory animus against Hispanics. The Defendant has moved for summary judgment. For the reasons given below, the motion will be granted.

**I. Background**

The District hired Plaintiff to teach bilingual education at Howe Elementary School for the 2009-10 school year. Not being a certified teacher, Robles was hired on a conditional contract and was assigned to teach bilingual kindergarten. Given that it was her first year as a teacher, Robles was watched closely and given on-the-job training and tutelage. For example, in September, another bilingual teacher named Ms. Seder went into her classroom to demonstrate how to teach the students. Later, Robles met with the principal, DeAnn Lehman, who formed the impression that Robles was unimpressed with Seder's approach to teaching and simply "wanted to teach how she wanted to teach." (ECF No. 35, ¶ 2.)

In October of the still-young school year, Principal Lehman began receiving complaints about Robles. These included the fact that she had left school one day without signing out; she was late for parent-teacher conferences, leaving a parent waiting in her classroom; she had brought her children to school for an entire afternoon; and she walked the halls without wearing shoes. (*Id.* at ¶ 4.) These complaints apparently raised red flags for Lehman because she instituted a series of meetings with Robles and began subjecting Robles' teaching to close scrutiny.

On November 16, Lehman observed Robles' classroom along with Claudia Orr, who was the principal of another elementary school at the time and also had substantial experience as a bilingual educator. Lehman believed that the class was not well-managed and that the students were disorganized and off-task. In Lehman's view, Robles did not appear to have a lesson plan and wasted instructional time by yelling at students and having them put on their coats early. (*Id.* at ¶ 10.) Orr's notes indicate that there were too many chants and rhymes in the class and "I am afraid she's just pulling activities from the air. Time fillers." (ECF No. 36-1 at 2.) She also noted other problems with classroom management, wasted time, kids hitting each other, and a general failure to set expectations. (*Id.*) She also did not understand the instructive purpose of some of the activities. (ECF No. 36 ¶ 4.)

In a post-observation meeting, Robles complained that Lehman had removed a college student-observer from her classroom and alleged that Lehman was "racial profiling" her. ( Lehman said that the student was transferred to a different class because students are only allowed to serve in the classrooms of certified teachers.) After Robles alleged racial bias, Lehman cancelled the meeting.

Robles later wrote up a document described as a "rebuttal/meeting summary." (*Id.*, Ex. F.) The document began by stating that the teaching problems Lehman had identified were exaggerated

"for the simple reason of [Robles] being Hispanic." (*Id.*) She further alleged that she had seen similar behavior and issues with other co-workers, but the issues had been overlooked by Lehman. The document contains a number of explanations for her behavior and requests help dealing with a problematic student named Michael.

On December 1, Lehman reconvened the meeting she had cancelled previously, but this time they were joined by John Wilson, a district HR representative and Julie Seefeldt, the associate director of English Language Learner Programs. Also present was the teachers' union executive director. During the meeting Lehman explained her concerns to Robles. These included some of the problems identified above, as well as the fact that Robles had failed to attend voluntary learning opportunities that the district offered.

Within the next week, both Julie Seefeldt and Claudia Orr observed Robles' classroom. Seefeldt believed Robles was inconsistent in classroom management issues, lost instructional time by failing to set expectations, failed to provide positive reinforcement, and inappropriately yelled at students. (ECF No. 34 at ¶ 10.) Orr, who observed the classroom several days later, concluded that Robles' classroom management had not improved in the areas the two had discussed. (ECF No. 36 at ¶ 7.) Once again, there appeared to be no lesson plan and teaching time was lost as a result. The activities "appeared to be frazzled and scattered." (*Id.*)

Observation continued in January 2010. On January 27, Orr again observed Robles' classroom. Orr continued to believe that Robles showed poor classroom management, inconsistency in dealing with behavior problems, and still failed to follow a lesson plan. (*Id.* at ¶ 9.) In addition, Robles was "extremely unprofessional" in her dealings with the problem student named Michael. (*Id.*) Orr concluded that she would not want her own children in Robles' classroom and

believed that, had Robles worked at Orr's school, she would have been removed from the classroom just as she was ultimately removed at Howe, "if not sooner." (*Id.* at ¶ 12, 14.)

Julie Seefeldt observed the classroom on February 2, 2010. Although there were signs of improvement in some areas, the classroom was chaotic; there was a physical altercation between two students; and Seefeldt was unable to discern the learning purpose behind some of Robles' activities. (ECF No. 34, ¶ 14.)

At a February 9 meeting, John Wilson informed Robles that she was being removed from the classroom due to her failure to improve her teaching performance. Reassigned to work at the District as a substitute teacher, she would continue to work throughout the rest of the school year. Rather than reporting for her new assignment, however, Robles called in sick each of the next three days. The following Monday and Tuesday, she did not report to work either, but these days she did not call in at all. At an unrelated meeting that Tuesday, John Wilson learned that Robles had driven that morning to Milwaukee to meet with the union's lawyer.

In a February 19 meeting, Wilson asked Robles where she was on the days she failed to call in sick. She responded that she was at home sick. When Wilson informed her that lying would be grounds for termination, she stuck with her story. (She continues to assert that she "fell ill" on those days.) Robles remained silent when confronted with the information about her trip to Milwaukee. During a break in the meeting, Robles walked out and never contacted Wilson after that. On March 5, Wilson sent her a letter indicating that her employment was terminated. Robles then instituted this lawsuit alleging racial discrimination.

## II. Analysis

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To establish a prima facie case of discrimination, a plaintiff must show: (1) she is a member of a protected group; (2) she satisfied her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably. *Naficy v. Ill. Dep't of Human Servs.,* 697 F.3d 504, 511 (7th Cir. 2012). If these elements are met, the burden shifts to the defendant to introduce a legitimate, non-discriminatory reason for the employment action. *Id.* On rebuttal, the plaintiff must provide evidence demonstrating that the defendant's stated reason is pretextual. *Id.* at 511–12.

## A. *Prima Facie* Case

The District argues that Robles cannot even make out a *prima facie* case of discrimination because she was not satisfying her employer's legitimate job expectations. As detailed above, Robles' brief tenure was characterized by a number of performance concerns corroborated by multiple knowledgeable sources. Within the first weeks, the principal began hearing complaints about her behavior, and subsequent observations by other staff uncovered additional problems. These issues did not get better with time, and the record is suggestive of Robles' lack of interest in making improvements.

Robles responds, in a single paragraph, that the employer's expectations here were not legitimate but instead were a concerted ruse in furtherance of discriminatory intent. In particular, she lays the blame at the feet of Michael, the problem student, and argues that the district could not legitimately expect her to deal with him without disrupting the classroom or compromising her teaching in other ways. But her treatment of Michael was only one of a number of performance concerns identified and corroborated by multiple individuals. Being able to maintain a classroom and follow a lesson plan are certainly legitimate expectations, and there was unanimity among the

observers that Robles was unable or unwilling to improve her ability to teach. Robles has no answer for this.

Robles complains that she was subjected to constant supervision and critique that other non-Hispanic teachers were not forced to endure. But that is the only way a school district would ever be able to evaluate a problem teacher. Evaluation and scrutiny are not the problem, they are the solution. If the District had fired her *without* conducting several classroom observations and meetings, Robles would likely argue that the district lacked evidence and was thus acting based on discriminatory intent. The fact that it undertook an extensive observation program and repeatedly tried to instruct her on how to do better is not evidence of discriminatory intent. The truth is that several different individuals, none of whom could be expected to have any kind of anti-Hispanic animus (in particular, Claudia Orr, who is described as a Hispanic bilingual teacher), all reached the conclusion that Robles was not improving her teaching skills. When a knowledgeable observer concludes that she would not want her own children in a given teacher's classroom, a school district would be doing a disservice to the community to keep the teacher in place. In such circumstances, it is impossible to say that the teacher is meeting a district's legitimate expectations.

That Robles' claim is transparently baseless is evident from the first whisper of discrimination in the record. When Principal Lehman removed a college student observer from Robles' classroom, Robles illogically, and poisonously, jumped to the conclusion that the reason for removing the student was that she was Hispanic. She now admits that the reason for the removal was the fact that Robles was not a certified teacher, (ECF No. 50 at ¶ 35), but that kind of phantom discrimination is emblematic of her whole case. After Lehman brought in others to help with the review process (having been baselessly accused of racism herself), Robles decided that these others must be in on the discrimination too—even the Hispanic principal of Eisenhower Elementary. From

the outset, the claim of discrimination was so baseless that even after a year and one-half of litigation, Robles cannot muster more than a single paragraph on the question of whether she had been meeting her employer's legitimate expectations.

It is true that in most cases discrimination is insidious and manifests itself through actions rather than words—particularly in the workplace. When actions are suggestive that discrimination has been at work, a jury might well conclude that discrimination has taken place despite the absence of any direct evidence. It is an inductive, quasi-scientific method, whereby the plaintiff comes forward with a hypothesis (discrimination occurred) and then a jury tests that hypothesis by deciding whether that theory is more likely true than not.

Here, by contrast, the specter of discrimination arose at the first conceivable opportunity, and then snowballed with every perceived slight Robles experienced. A new teacher must expect that there will be some amount of constructive criticism from a supervisor, particularly when the supervisor has received complaints from third parties. Here, there is no inkling that the criticism was particularly harsh or that it took on any personal character at all. Constructive criticism is part of the pedagogic process, and thus it is illogical (not to mention irresponsible) to ascribe perfidious motives to a supervisor when perfectly ordinary ones would explain the conduct much more readily. In other words, this is not the kind of case where a number of things occurred over time and the employee began to suspect, based on the mounting evidence, that discrimination might be occurring. Instead, Robles decided at the very first opportunity—after only weeks on the job—that racial discrimination must be behind Lehman's actions, and from that moment on her theory of discrimination was taken as a matter of truth insulated from reason and experience. At the summary judgment stage, she compounds this problem by blaming others for her behavior but never actually contesting the fact that several different knowledgeable individuals considered her performance sub-

par. In short, there is no admissible evidence that would undermine the Defendant's assertion that Robles was not meeting its legitimate expectations.

**III. Conclusion**

For the reasons given above, the motion for summary judgment is **GRANTED**.

**SO ORDERED** this   15th   day of April, 2014.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
